# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 1:23-cr-005 |
| | ) |
| OCTAVIUS MYRON JOHNSON, | ) By:   Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter comes before the court on defendant Octavius Johnson's Motion to Suppress, ECF No. 37. The government opposes this motion. ECF No. 50. Johnson argues that the evidence obtained in the search of 70 Southland Drive, Martinsville, Virginia (the "70 Southland Drive" property) on February 27, 2023, should be suppressed because (1) the affidavit on which the warrant issued was defective and (2) the good-faith exception to the exclusionary rule does not apply. ECF No. 38. Because the court disagrees on both points, Johnson's motion is **DENIED**.

### I.  Background

The warrant Johnson challenges was issued on February 24, 2023, by Magistrate Judge Pamela Meade Sargent. ECF No. 28-2, at 2. The warrant authorizes the search of 70 Southland Drive, including "the residence, curtilage, garages, outbuildings," Johnson's person, if present, as well as vehicles under Johnson's control. Id. The warrant indicates that the property was believed to conceal "methamphetamine distribution paraphernalia" such as "scales, cutting material, plastic baggies, wrapping material," communication devices and counter-surveillance tools, as well as other records and messages relating to methamphetamine trafficking, personal

property showing ownership and control over the property, and large amounts of currency. ECF No. 38-2, at 5.

The warrant was supported by a sworn affidavit (the "Snedeker Affidavit") from Drug Enforcement Agency ("DEA") Special Agent Brian Snedeker ("Snedeker"). ECF No. 38-1, at 5–10. The Snedeker Affidavit begins with a statement that Snedeker "believes there is evidence of distribution and/or conspiracy to distribute methamphetamine at 70 Southland Drive, Martinsville, Virginia." Id. at 5. Snedeker disclosed that he had been employed by the DEA for thirty-two years, had participated in hundreds of investigations related to methamphetamine trafficking, and had executed hundreds of search warrants related to these investigations. Id.

Snedeker recounted how the investigation into Johnson grew out of an investigation into the narcotics trafficking activities of another individual, referred to as "Trafficker A." Id. In January 2023, law enforcement seized "a variety of controlled substances including cocaine, marijuana and multiple ounces of methamphetamine" from Trafficker A. Id. She subsequently agreed to speak with law enforcement. Id.

According to Trafficker A, Johnson is an armed drug trafficker who had regularly sold her cocaine and marijuana for the previous six months and methamphetamine for the past several months, at prices of $3,500 per pound of methamphetamine, $1,000 per ounce of cocaine, and $1,100 to $1,500 for each pound of marijuana. Id. at 5–6. Trafficker A said that Johnson would personally deliver the controlled substances to her near her home and that Johnson himself resided in Martinsville. Id. at 6. Snedeker added an annotation to this statement, indicating that Johnson's "known residence is located in Martinsville, Virginia,

2

more than two hours away from Trafficker A's residence." Id. Trafficker A indicated that Johnson would contact her by phone—either by phone call or text—when Johnson was near Trafficker A's location. Id. She told law enforcement that Johnson had two cars: a dark-colored Dodge Challenger and a white Toyota Camry. Id. Trafficker A shared the phone number she used to contact Johnson, identified as "Cell Phone 1." Id. Snedeker annotated this statement by noting that the Virginia Department of Motor vehicles records reflect that Johnson owns a gray Dodge Challenger and a white Nissan Altima and that Snedeker "believes that Trafficker A misidentified the make and model of OCTAVIUS JOHNSON's white car." Id.

Trafficker A allowed law enforcement to examine her phone, which contained text and chat communications between Trafficker A and Cell Phone 1. Id. at 6–8. In a meeting on February 6, 2023, Trafficker A told law enforcement that she remained in contact with Johnson and that Johnson had told her that he had access to or was in possession of ten pounds of methamphetamine. Id. at 8.

Law enforcement reviewed records from Cell Phone 1, finding that there were at least thirty contacts—either texts or calls—between Cell Phone 1 and Trafficker A's phone between January 1, 2023, and January 24, 2023. Id. According to these records, Cell Phone 1 is associated with a customer named "BEE GEE" and an address in Axton, Virginia. An employee of the Guilford County North Carolina District Attorney's Office told Snedeker that the Axton, Virginia address was associated with Johnson in two 2015 criminal cases. Snedeker searched Thompson-Reuters CLEAR database and found that Johnson was connected to the Axton address through credit bureaus, bank account records, and court

3

records. Id. Snedeker stated that he believed a female relative or other associate of Johnson resides at the Axton address and that Johnson uses the home as a mail drop. Snedeker concludes this paragraph by stating that "Axton, Virginia is located approximately (9) miles from Martinsville, Virginia, the town in which OCTAVIUS JOHNSON is known to currently reside." Id.

On February 23, 2023, Trafficker A reported that she had been in contact with Johnson that same day, and that Johnson was prepared to sell drugs to her on February 24, 2023. Id. at 8–9.

Snedeker recounts Johnson's criminal history related to drugs and firearms, which includes several dismissed or nolle prossed charges: a 2004 arrest for felony possession of cocaine and misdemeanor possession of up to a half ounce of marijuana; a 2005 arrest for possession of a firearm and a controlled substance, and a 2021 felony arrest for being a felon in possession of a firearm. Johnson's record also includes several convictions: a 2005 conviction for possession of a controlled substance, a 2006 felony conviction for possession of cocaine, 2016 felony convictions for two counts of distributing controlled substances, and a 2021 felony conviction for possession with intent to sell and/or distribute marijuana. Id. at 9.

Snedeker states that "based on his training, experience, and conversations with other law enforcement officers that individuals who distribute and/or conspire to distribute methamphetamine typically maintain methamphetamine, methamphetamine distribution paraphernalia . . . and other items . . . at their residences . . . on their persons, and inside of

4

their vehicles . . . ." Id. Snedeker noted that a search warrant had already been obtained for Johnson's person and vehicle.

At the end of the affidavit, Snedeker states that "OCTAVIUS JOHNSON's known residence is 70 Southland Drive, Martinsville Virginia (confirmed by law enforcement in Henry County, Virginia)" and provides his ultimate conclusion: "Based upon the facts set forth above, I believe there is probable cause for the issuance of a search warrant for the premises known as 70 Southland Drive, Martinsville, Virginia . . . as there is probable cause to believe that there is evidence of a violation of 21 U.S.C. § 841(a)(1) and § 846/841(a)(1) at said premises."

According to the Report of Investigation, ECF No. 38-4, law enforcement executed a distinct search warrant on Johnson's person on February 27, 2023, at the Martinsville, Virginia, YMCA. ECF No. 38-4, at 3. Johnson's Avis rental car was also searched at this time. Id. Snedeker had previously observed this rental car during "an attempted delivery of controlled substances to a . . . confidential source" on February 25, 2023, id., the day following the warrant application. Snedeker and a detective then drove Johnson back to 70 Southland Drive to execute the now-challenged warrant. Snedeker himself signed the warrant return. Ultimately, the search of the home resulted in the seizure of 280 grams of methamphetamine, ninety-seven grams of cocaine, several pounds of marijuana, two loaded firearms, several loaded handgun magazines, an electronic money counter, and $3,800 in cash. Id. at 2.

In their memorandum in opposition, the government points to additional evidence tying Johnson to 70 Southland Drive, but not disclosed in the Snedeker Affidavit. ECF No. 50, at 14. The government states that law enforcement began physical surveillance as early as

5

February 10, 2023, and began specifically surveilling 70 Southland Drive shortly thereafter. Id. The government provided text messages between Snedeker and DEA Task Force Officer Darrell Foley, which suggest that law enforcement saw Johnson at 70 Southland Drive on February 22, 2023, two days before Snedeker sought the residential search warrant. ECF No. 50-3, at 3. On February 21, 2023, Judge Sargent signed a search warrant authorizing law enforcement to obtain location data from the phone suspected to be used by Johnson. ECF No. 50-2, at 1, 23–25. The government began collecting location data on February 21, 2023, at 1:20 PM, id. at 33, three days before Agent Snedeker applied for residential search warrant, and claims this electronic surveillance "confirmed the phone's location to be repeatedly in the vicinity of 70 Southland Drive." ECF No. 50, at 14.

## II. Legal Standard

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against" which the Fourth Amendment "is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (internal quotations omitted). "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). "One of the touchstones of the reasonableness requirement is that the police must

6

generally obtain a warrant based upon a judicial determination of probable cause before entering the home." Ziegler v. Aukerman, 512 F.3d 777, 785 (6th Cir. 2008).

When evidence is obtained in violation of the Fourth Amendment, the "exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." Illinois v. Krull, 480 U.S. 340, 347 (1987). The exclusionary rule "operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Leon, 468 U.S. 897, 906 (1984) (internal quotations omitted).

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993). "The defendant bears the burden of proving that he has a reasonable expectation of privacy. If the defendant does have such an expectation, then the court must determine the reasonableness of the search and seizure." United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (internal citation omitted). "Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." Adkinson, 191 F. Supp. 3d at 568 (citing United States v. Matlock, 415 U.S. 164, 177–78 & n.14 (1974)).

### III.   Analysis

The challenged warrant was supported by probable cause and, even if it was not, the good faith exception applies.

### A.  Probable Cause

Johnson contends that the "warrant affidavit failed to establish a sufficient nexus between the suspected offense and the place to be searched," and thus "was not supported by probable cause." ECF No. 38, at 4. In reviewing a warrant, the court's duty is to ensure that the magistrate judge had a "substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238–39 (1983). While the "determination of probable cause by the issuing magistrate is entitled to great deference," United States v. Drummond, 925 F.3d 681, 687 (4th Cir. 2019) (cleaned up), "this does not mean that warrants based on conclusory allegations should be upheld," United States v. Wilhelm, 80 F.3d 116, 119 (4th Cir. 1996) (internal quotations and citations omitted). After thorough review, the court concludes that the Snedeker Affidavit establishes probable cause for the search of 70 Southland Drive.

Probable cause "exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found in the place to be searched." Drummond, 925 F.3d at 687 (quoting United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010)). The magistrate 'issuing a search warrant must simply make a practical, commonsense determination—based on the totality of the circumstances revealed in the affidavit—of whether there is a substantially likelihood that evidence of a crime will be found in a particular place.'" Id. (quoting United States v. Allen, 631 F.3d 164, 173 (4th Cir. 2011)).

8

"In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 556 & n.6 (1978)). "[T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988). This nexus may be established "even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to the defendant's residence.'" United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005) (citing United States v. Servance, 394 F.3d 222, 230 (4th Cir. 2005)). In United States v. Williams, the magistrate fairly concluded that evidence of drug dealing would be found at a specific address because the affidavit established that the defendant was a drug dealer who lived at that address. 974 F.2d 480, 480–81 (4th Cir. 1992). This determination was upheld even in the absence of specific evidence tying drug trafficking activity to the residence. Id.

Like in Williams and Grossman, there was ample evidence here that Johnson was dealing controlled substances. Johnson is closely linked to Cell Phone 1. Cell Phone 1 is registered at an address connected to Johnson through court and credit bureau records. Further, Cell Phone 1 is saved in Trafficker A's phone under Johnson's nickname, "Ta," and Trafficker A identified Cell Phone 1 as belonging to Johnson. Johnson's prior convictions related to distribution of controlled substances, combined with Trafficker A's statements to law enforcement and the messages between Trafficker A and Cell Phone 1 establish probable

9

cause that Johnson was dealing pound quantities of methamphetamine over the course of several months. Under such circumstances, "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." Grossman, 400 F.3d at 218 (citing Williams, 974 F.2d at 481; c.f. United States v. Woodley, 47 F.Supp.3d 487, 489 (E.D. Va. 2020) (holding that there was no probable cause to search the residence of an individual found with a small quantity of drugs, when no additional evidence suggested trafficking activity).

In United States v. Procopio, 88 F.3d 21, 28 (1st Cir. 1996), the court noted that that the district court below "held that the warrant should not have been issued . . . because nothing in the affidavit established probable cause to believe" that the defendant lived there. Unlike in Procopio, the Snedeker Affidavit sufficiently ties Johnson to 70 Southland Drive by stating, under oath, that Henry County law enforcement confirmed that this was Johnson's residence. This is not a merely conclusory statement and Snedeker was under no obligation to state every investigative method used to confirm Johnson's residence. Therefore, the magistrate judge was entitled to rely upon this statement in finding probable cause for the warrant.

### B. Good Faith Exception

Even if the Snedeker Affidavit did not sufficiently establish probable cause for the search of 70 Southland Drive, the good faith exception applies.

Pursuant to the good faith exception, the exclusionary rule does not bar evidence "obtained in objectively reasonable reliance on a" search warrant, even if that warrant is later held invalid. Leon, 468 U.S. at 922. There are four exceptions to the good faith exception. Id. at 923. Johnson claims that this warrant falls into one such exception to the exception, arguing that the Snedeker Affidavit was "'so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable.'" Id. (quoting Brown v. Illinois, 422 U.S. 590, 609 (1975) (Powell, J., concurring)).

The good-faith exception applies to the search of a suspect's residence "on the basis of (1) evidence of the suspect's involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." United States v. Williams, 548 F.3d 311, 319 (4th Cir. 2008). As detailed above, Snedeker had evidence that Johnson was involved in trafficking methamphetamine and a reasonable suspicion that, as a drug-trafficker, drug-related evidence would be stored in his home.

> The key, "objectively ascertainable question" under Leon is "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" [United States v. McKenzie-Gude, 671 F.3d 452, 459 (4th Cir. 2011),] (quoting Leon, 468 U.S. at 922 n.23, 104 S.Ct. 3405). Among those circumstances are "specific, uncontroverted facts known to the officer[ ]," id. at 460, which necessarily inform the objective reasonableness of an officer's determination regarding probable cause, even if they are omitted inadvertently from a warrant application. And when an officer's belief in the existence of probable cause is objectively reasonable, he or she has no reason to second guess the magistrate's decision to issue a warrant, and acts in good faith when executing the search. Id. at 459, 461; see also Leon, 468 U.S. at 920–21, 104 S.Ct. 3405.

United States v. Thomas, 908 F.3d 68, 73 (4th Cir. 2018). Snedeker—who not only authored the affidavit, but appears to have participated in the search and signed the warrant return— was aware of additional facts not disclosed in the affidavit that clearly render his belief in the existence of probable cause objectively reasonable. Through the search warrant providing cell phone location data, Snedeker knew that Cell Phone 1 had been in the vicinity of 70 Southland Drive. Snedeker was in regularly in contact with Foley, who was assigned to the Henry County

11

Sherriff's Office. Foley conducted surveillance of 70 Southland Drive, reporting that Johnson had been at the home in the days before the search warrant application, even on the very morning Snedeker applied for the warrant. C.f. Woodley, 447 F. Supp. 3d at 495 (finding that additional facts known to the government omitted from the warrant affidavit did not support probable cause, as the officers did not specifically see Woodley at his residence).

Through his extensive contact with Foley, Snedeker was aware of the facts establishing that Johnson resided at 70 Southland Drive. From his review of Trafficker A's statements to law enforcement and text messages with Cell Phone 1, as well as his knowledge of the connection between Cell Phone 1 and Johnson, Snedeker had evidence that Johnson was trafficking controlled substances. Therefore, Snedeker "could reasonably rely on the warrant based on the evidence he had seen in investigating the case." Wilhelm, 80 F.3d at 122; see also Procopio, 88 F.3d at 28 (applying the good faith exception where the officer was aware that the defendant's address had been confirmed via surveillance, though the corroborating details were absent from the warrant application).

### IV. Conclusion

For the aforementioned reasons, Johnson's Motion to Suppress, ECF No. 37, is **DENIED**.

It is **SO ORDERED**.

Entered: July 27, 2023

Digitally signed by Michael F. Urbanski   Chief U.S. District Judge
Date: 2023.07.27 12:03:47 -04'00'

Michael F. Urbanski
Chief United States District Judge